# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **I.W., a minor, by and through parents A.M.V. and D.W.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 17 C 7426** |
| | ) | |
| **LAKE FOREST HIGH SCHOOL DISTRICT NO. 115 and ILLINOIS STATE BOARD OF EDUCATION,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM ORDER AND OPINION

I.W. is a teenage high school student with multiple disabilities that affect her educational, social, and psychological development. She resides with her parents within Lake Forest High School District No. 115 ("the District"). After she spent the 2014-15 school year attending Lake Forest High School, I.W.'s parents removed her from the school and placed her in a private residential high school in Massachusetts. They filed a due process complaint with the Illinois State Board of Education against the District in April 2016, arguing that the District had failed to provide I.W. with the "free appropriate public education" ("FAPE") required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1412(a)(1)(A), and requesting reimbursement for two school years of private school tuition.

An independent hearing officer heard the complaint, pursuant to 20 U.S.C. § 1415, and concluded that the school had failed to provide I.W. a FAPE.[1] Defendant Lake Forest High School District No. 115 has not challenged that determination. The Hearing Officer also determined, however, that I.W.'s Parents were not entitled to reimbursement because they had not proven that the private school was an appropriate placement for I.W. (Final Determination and Order

---

[1] The District has not challenged this determination.

("I.H.O. Order") [23-1], at AR 281, 283.). I.W., by and through her parents, filed an appeal of that tuition reimbursement decision with this court. Plaintiffs and Defendant Lake Forest High School District No. 115 now cross-move for summary judgment solely on the issue of reimbursement.[2]

## STANDARD OF REVIEW

The standard for summary judgment in an IDEA case differs from that of typical motions for summary judgment. *M.B. ex rel. Berns v. Hamilton Se. Sch.*, 668 F.3d 851, 859 (7th Cir. 2011). Under the IDEA, "the district court 'shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.'" *Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M.*, 356 F.3d 798, 802 (7th Cir. 2004) (quoting 20 U.S.C. § 1415(e)(2)). In cases like this one, where the parties have submitted no additional evidence, "[t]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *M.B. ex rel. Berns v. Hamilton Southeast Sch.*, 668 F.3d 851, 860 (7th Cir. 2011) (internal quotation marks and citations omitted) (modification in original).

In reviewing the administrative record, the hearing officer's determinations of law are reviewed *de novo*. *M.B.*, 668 F.3d at 860. *See Marshall Joint Sch. Dist. No. 2 v. C.D. ex rel. Brian D.*, 616 F.3d 632, 636 (7th Cir. 2010) (noting that legal issues receive "plenary review"). The hearing officer's findings of fact are owed "due weight." *M.B.*, 668 F.3d at 860. "This review is equivalent to a 'clear-error' or 'substantial-evidence' standard." *M.B.*, 668 F.3d at 860. *See Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 612

---

[2]      Plaintiffs' Complaint [1] contains two counts. Count I claims that Defendant failed to provide I.W. a FAPE, in violation of IDEA § 1412, and Count II claims I.W.'s Individualized Education Programs ("IEPs") were deficient, in violation of § 1414. The Hearing Officer, in fact, found in Plaintiffs' favor on both counts in his prior ruling. The court thus construes Plaintiffs' complaint as a challenge solely to the Hearing Officer's finding on the reimbursement issue. (Complaint [1], at ¶¶ 5–6, 12–14 (stating that I.W. and her parents seek to uphold the hearing officer's determination that the District failed to provide I.W. with a FAPE, but seek to overturn his denial of tuition reimbursement).)

(7th Cir. 2004) (noting that, when a district court "relies solely on the administrative record, it owes considerable deference to the hearing officer, and may set aside the administrative order only if it is 'strongly convinced that the order is erroneous'") (quoting *School Dist. v. Z.S.*, 295 F.3d 671, 675 (7th Cir.2002)). At all times, "the party challenging the outcome of the administrative hearing bears the burden of persuasion in the district court." *Marshall Joint Sch. Dist. No. 2 v. C.D. ex rel. Brian D.*, 616 F.3d 632, 636 (7th Cir. 2010) (citing *Alex R. v. Forrestville Valley Cmty Unit Sch. Dist.*, 375 F.3d 603, 611 (7th Cir.2004)).

## BACKGROUND

I.    **I.W.'s Early Life and Elementary School Experience**

When she was three years old, I.W. was adopted by her mother and father ("Parents"). Shortly thereafter, she was diagnosed with "mixed receptive-expressive language disorder" and fetal alcohol exposure. (Df.'s Local Rule 56.1 Statement of Undisputed Material Facts ("Df.'s SOF") [27], at ¶ 8.) At the age of seven, I.W. underwent a private psychological evaluation by Clinical Psychologist Dr. Rebecca Nelson ("2007 Report"). (*Id.* at ¶ 9; Pl.'s Statement of Facts Pursuant to Rule 56.1 ("Pl.'s SOF") [30], at ¶ 5. *See* 2007 Report [23-2], at AR 545.[3]) The Hearing Officer summarized Dr. Nelson's 2007 findings:

> Dr. Nelson identified many clinically elevated levels of anxiety, decreased self-esteem, relatively less favorable social skills than peers, significant challenges in language-based problem solving, perceptual reasoning difficulties, and impaired working memory. Dr. Nelson found the Student to have relatively low cognitive ability and to be highly distractible. At that time Dr. Nelson found that the Student did not meet the clinical criteria for Attention Deficit-Hyperactivity Disorder ("ADHD").

---

[3]    The Illinois State Board of Education filed the sealed administrative record ("AR") as document 23 in this case. When the court refers to a document in the AR, it will reference the consecutive pagination that appears in the bottom center of each page. The hearing transcript was also submitted as part of document 23, but it contains separate pagination. When citing to that transcript, the court will so note.

(I.H.O. Order [23-1], at AR 267.)   Dr. Nelson made several recommendations based on her findings, including "an IEP [Individualized Education Program[4]] or 504 plan[,] . . . a multitude of suggested accommodations and modifications," such as preferential seating and breaking down lengthier assignments, and "speech and language and social skills services."  (Df.'s SOF [27] at ¶ 9.  *See* Pl.'s SOF [30], at ¶¶ 5–6; 2007 Report [23-2], at AR 566–570 (listing all of Dr. Nelson's educational recommendations).)

At the end of I.W.'s fourth-grade year, clinical neuropsychologist Dr. Jo-Anne Hoeppner and psychoeducational diagnostician Dr. Dorit Raviv conducted second private psychological evaluation ("2010 Report").   (2010 Report [23-2], at AR 319.)   By that time, I.W.'s child psychologist, Dr. Bloomberg, had diagnosed her with ADHD (inattentive subtype), and she was taking ADHD medication.  (Pl.'s SOF [30], at ¶ 9; 2010 Report [23-2], at AR 326, 327.)  The 2010 Report found that I.W. "demonstrated solidly average verbal and nonverbal reasoning as well as processing speed. This represents a significant improvement relative to the previous evaluation three years ago."  (2010 Report [23-2], at AR 326.)  The evaluators also found, however, that she had "some difficulties on working memory tasks that have a sequencing component," that her "deficits [were] still apparent in her weak vocabulary, difficulty with auditory sequencing and following directions," and that she had some trouble with math.  (*Id.*)   This Report again recommended, among other things, adding executive functioning goals to her IEP, providing her with a host of reading strategies, giving her repeated instructions accompanied by visuals, providing extra vocabulary support, and continuing speech and language services.  (*Id.* at AR

---

[4]      "Under the IDEA, an 'individualized education program,' called an IEP for short, serves as the 'primary vehicle' for providing each child with the promised FAPE. Crafted by a child's 'IEP Team'—a group of school officials, teachers, and parents—the IEP spells out a personalized plan to meet all of the child's 'educational needs.' Most notably, the IEP documents the child's current 'levels of academic achievement,' specifies 'measurable annual goals' for how she can 'make progress in the general education curriculum,' and lists the 'special education and related services' to be provided so that she can 'advance appropriately toward [those] goals.'" *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017) (citations removed).

327–29.)  The Hearing Officer found three recommendations from the Report to be particularly "noteworthy":

> First, it was suggested that Language Arts instruction and speech and language therapy be coordinated for the Student. Second, assistive technology for written expression was recommended. Third, a multi-sensory sequential explicit math program that included, for example, visuals, manipulatives and practical examples was suggested.

(I.H.O. Order [23-1], at AR 267.)

Several other professionals began working with I.W. during her elementary school years. Ellen Kroft Apley ("Kroft"), an educational therapist, began working with I.W. before first grade, in July 2006.  (Pl.'s SOF [30], at ¶ 7.)  Speech and language pathologist Mara Lane has worked with I.W. since 2008, when she was in third grade.  Dr. Bloomberg, the child psychiatrist mentioned above, also began working with I.W. while she was in third grade.  (*Id.* at ¶ 9; Df.'s SOF [27], at ¶ 16.)  Each of these individuals has continued to be involved with I.W. through the time of this case's filing.

At some point prior to the eighth grade, I.W. appears to have been placed on an IEP, as recommended by the 2007 Report.  (*See* Document List [23-1], at AR 128 (noting the existence of a 2010 IEP).)  A detailed discussion of I.W.'s past IEP's is not necessary to the resolution of the tuition reimbursement issue in this case.[5]  Some background on her early education is helpful,

---

[5]        In his Final Determination and Order, the Officer explained:

> [T]he IEP implemented during [I.W.'s] first semester [at LFHS] was the documented dated February 7, 2014.  This IEP . . . and the process used to develop it were seriously procedurally flawed, and as a result, the Parents were denied a meaningful opportunity to participate in the IEP process, denying the Student educational benefit.

(I.H.O. Order [23-1]. at AR 282.)  He continued by finding that I.W.'s IEP "for the remainder of her freshman year also denied her a FAPE."  *Id.* at AR 283.  He explained that "IEP of January 26, 2015 . . . met IDEA's procedural requirements, but failed to substantively address [I.W.'s] educational and related services needs in accordance with the evaluations and recommendations available to the District at the time.  It was also based on dated information."  *Id.*  The District has not challenged these findings.

however. In 2011, I.W. was attending fifth grade at Deerpath School in Lake Forest. In the middle of that year, she was moved to a therapeutic day program called the Cove School, at least in part due her experiencing "significant anxiety and stress" at Deerpath.[6] (Evaluation of IEP Data 1/5/2011 [23-3], at AR 753. *See also* Hearing Transcript [25-3], at 46:12–15 (Mother)[7] (testifying that in December of fifth grade, I.W. was "out of her mind" and "would not go back to school" at Deerpath).) Near the end of seventh grade, I.W. moved back to Deerpath,[8] where she remained through eighth grade. (*Id.*)

The administrative record contains two IEP documents from I.W.'s eighth grade year—the year before she entered Lake Forest High School. The first is an IEP conference document from early in I.W.'s eighth grade year, in September 2013. (IEP Conference Summary Report 9/23/2013 [23-3], at AR 740; Df.'s Cross-Response to Pl.'s SOF [32], at ¶ 12.) The Hearing Officer noted that "there are no participants' signatures" for that conference, "so it is unclear whether a meeting was even held." (I.H.O. Order [23-1], at AR 268, 276.) Another IEP conference was documented in February 2014. (IEP Conference Summary Report 2/7/14 [23-2], at AR 527.) That document lists the names of participants, but again contains no signatures (*id.* at 268), and I.W.'s mother testified that she did not attend that meeting. (Hearing Transcript [23-6], at 362:20–23 (Mother).) The Hearing Officer concluded that the 2014 "IEP summary report was prepared in anticipation of a meeting that never took place," and that the "process used to develop it were [sic] seriously procedurally flawed." (I.H.O. Order [23-1], at AR 276, 282.)

---

[6]     The Hearing Officer did not note this reason for I.W.'s move to Cove. (*See* I.H.O. Order [23-1], at AR 268 ("The hearing record lacks detail as to why she was placed at [the therapeutic day school], other than that she was having difficulties at Deerpath.").)

[7]     When citing to the due process hearing transcript, the court will note the name of the testifying witness in parentheses for clarity.

[8]     The Hearing Officer noted that I.W.'s mother testified at the due process hearing that "the other students [at Cove] were socially below [I.W.'s] level." (I.H.O. Order [23-1], at AR 268.) Mother also testified that she wanted I.W. to go back to Deerpath so that she could play sports. (Hearing Transcript [23-5], at 45:21–46:1.)

## II.     Lake Forest High School

I.W. began her freshman year of high school at Lake Forest High School ("LFHS") in the Fall of 2014.  (Df.'s SOF [27], at ¶ 21.)  Her "operative IEP" at the beginning of high school was the February 2014 IEP.  (Df.'s Cross-Response to Pl.'s SOF [32], at ¶ 16.)  The Hearing Officer explained that that "IEP . . . and the process used to develop it were seriously procedurally flawed, and as a result, the Parents were denied a meaningful opportunity to participate in the IEP process, denying the Student educational benefit."  (I.H.O. Order [23-1]. at AR 282.)  Then, in January of I.W.'s freshman year (2015), her mother, Ms. Kroft, Ms. Lane, some of I.W.'s general education teachers, and a host of other LFHS staff and administrators held an IEP conference.  (Conference Attendance Sheet [23-2], at AR 337.)  There, they determined that I.W. continued to have a "specific learning disability and speech and language impairment," and that she should continue to receive special education services.  (I.H.O. Order [23-1], at AR 276.)  The IEP provided for accommodations that the Hearing Officer noted "were mainly used for testing [ ] includ[ing] extended time, a separate testing location, modification of test format, a calculator and reading tests to [I.W.]. [I.W.] was also generally offered note-taking assistance, computer/word processing for all assignments, forgiveness for spelling errors and increased time for assignments."  (*Id.* at AR 277.)

The Hearing Officer determined that the January 2015 IEP was substantively "deficient in several areas."  (*Id.*)  These include failures to "require one-on-one direct instruction," to include preferential seating, to provide assistive technology other than "computer/word processing,"  to include an executive functioning skills goal, to coordinate speech and language therapy across classes other than English, to "include the services recommended in the 2007 and 2010 [Reports] to address her reading comprehension disability," or to provide "behavioral and social/emotional interventions."  (*Id.* at AR 277–78.)  These failures led the Hearing Officer to conclude that the IEP "failed to substantively address [I.W.'s] educational and related services needs."  (*Id.* at AR 283.)

During her freshman year at LFHS, I.W. had a team of individuals working with her; in addition to Dr. Bloomberg, Ms. Lane, and Ms. Kroft, who were already working with I.W., I.W.'s parents hired tutors to help I.W. with her math and World Civilization classes. (Df.'s Cross-Response to Pl.'s SOF [32], at ¶ 29.) LFHS also provided support for I.W. through a team including Katherine "Katie" Secker, I.W.'s case manager and resource teacher; Karen Shane, the LFHS school psychologist; Sherry Manzella, the school's speech pathologist; and Megan Miles, a school counselor.

Despite this support, I.W.'s grades at LFHS were relatively poor. Plaintiffs note that she had D's and F's during her first semester of high school (*see* Hearing Transcript [25-3], at 53:2–11 (Mother)), but the District points out that her final grades for the first semester were C-, B, B, C, C, B, and B. (Official Transcript [23-2], at AR 490.) Her final grades for the second semester were similar. (*Id.*). I.W.'s mother testified that I.W. was the subject of some bullying during her time at the high school. (Hearing Transcript [23-5], 130:4–131:10 (Mother).) I.W. suffered from increasing anxiety, as well. (*See* E-mail Chain 4/24/15 [23-2], at AR 378–80; E-mail from Mother to Karen Shane 4/28/15 [23-2], at AR 381; Hearing Transcript [23-5], at 116:10–121:0 (Mother) (discussing her communications with LFHS about her daughter's increasing anxiety).)

By November of her freshman year (2014), I.W.'s treating psychiatrist admitted I.W. to Compass Health Center, which is a "partial hospitalization" program. (Hearing Transcript [23-7], at 693:7 (Bloomberg); Answer [6], at ¶ 59.) Dr. Bloomberg describes the program:

> Compass is not a hospital, so children and adolescents don't sleep there, but it's a higher level of care than simply seeing a therapist or psychiatrist in the office in that children attend usually between like 9:00 and 2:30, Monday through Friday. They are in group therapies which are all skill building therapies. There is a schoolhouse that takes place for approximately 90 minutes during that period of time.

(Hearing Transcript [23-7], at 692:17–693 (Bloomberg).) Compass also has an "intensive outpatient" program, which Dr. Bloomberg "believe[s] was from 4:00 to 6:00." (Hearing Transcript [23-7], at 704:17–21.) Though Dr. Bloomberg testified that he "believe[s] [I.W.] was in the partial hospitalization program in the morning," it appears that I.W. continued to attend LFHS

simultaneously. (Psychoeducational Reevaluation Report 9/6/2016 [23-2], at AR 601–02 (noting that the Compass "program ran after school hours to allow [I.W.] to continue to be involved in school and maintain stability in her daily routine."); Hearing Transcript [25-3], at 40:5 (Mother) (calling Compass "an outpatient after school program").) I.W. participated in that program for part of November and December 2014 before returning to LFHS.

Frustrated with her daughter's situation at LFHS, I.W.'s mother began looking for another school for her daughter in "early May, late April" 2015. (Hearing Transcript [23-5], at 133:16 (Mother).) She searched the internet, talked to the parents of other students with disabilities, and consulted the professionals who worked with I.W. (*Id.* at 134:15–135:10.) The family visited and applied to several boarding schools that work with students with disabilities.

On June 4, 2015, a few days before the end of the 2014-2015 school year, I.W.'s family sent a letter to the school requesting another IEP meeting, with the specific purpose of "updating [I.W.'s] IEP to recommend that she continue her education next year at a specialized school better suited to her individual disabilities and consequent needs." (Letter 6/4/2015 [23-3], at AR 773; Hearing Transcript [23-5], at 134:6 (Mother).) In its June 17 response, the District announced that the meeting would not be "feasible" over the summer while teachers were out, and that an IEP meeting would be planned for August. (Hearing Transcript [23-5], at 142:11–21 (Mother); E-mail 7/17/2015 [23-3], at 775.)

On July 7, 2015, Plaintiffs' attorney notified LFHS that I.W. would withdraw from LFHS and enroll at Eagle Hill School in Hardwick, Massachusetts. (Letter 7/7/2015 [23-3], at AR 777.) The letter expressed a "hope that [LFHS] will compensate the [ ] family for the costs of [I.W.]'s continued enrollment at Eagle Hill School, without resort to litigation," and a willingness "to cooperate (within reason) with the school and district in the conduct of any assessments they may deem necessary to corroborate the opinions of [I.W.'s] treatment team." (*Id.*) An August meeting between I.W.'s mother, Plaintiffs' counsel, the District's special education director, and the District's counsel followed. (Hearing Transcript [23-5], at 143:16–145:1 (Mother).) As a result of

the meeting, I.W.'s family produced documents for the district, and an IEP meeting was scheduled for September 3, 2015 to consider I.W.'s school placement. (Pl.'s Due Process Request Brief [23-1], at AR 10.) At the September 3 meeting, the IEP team discussed "the amount of people that [I.W] had on her team [at LFHS], the opportunities that she had to see those people throughout the day, [and the] types of classes she was taking." (Hearing Transcript [23-5], at 289:5–8 (Secker).) They also discussed I.W.'s "progress" at LFHS and "her grades." (*Id.* at 289:16.) Ultimately, the "IEP team made a determination that residential placement was too restrictive for [I.W.] and that Lake Forest High School was an appropriate placement." (I.H.O. Order [23-1], at AR 279. *See* Hearing Transcript [23-5] 279:24–280:3 (Secker).)

### III. Eagle Hill School, 2015-2016 School Year

I.W. did not re-enroll in LFHS for the 2015-2016 school year, however. Ms. Kroft and Ms. Lane both testified that they did not think LFHS was an appropriate placement for I.W. Ms. Kroft stated that she "didn't feel like Lake Forest was providing the correct environment for [I.W.] . . . It wasn't right." (Hearing Transcript [23-8], at 829:14–23 (Kroft).) Ms. Lane similarly testified that she "did not think that placement at Lake Forest High School was appropriate. [She] told that to [I.W.'s] family." (*Id.* at 657:20–658:1 (Lane).) Instead, I.W. enrolled at Eagle Hill School, a private college preparatory school that specializes in certain types of disabilities, to repeat her ninth-grade year.[9] The programming available to I.W. at Eagle Hill lies at the heart of this case.

The Eagle Hill website includes a page entitled "Is EHS Right for You?" (Website [23-3], at AR 784.) That page states that "Eagle Hill is able to work with students who display relative weaknesses in processing speed and/or working memory" and that it "works with students who

---

[9]    I.W. did not fail her ninth-grade year at LFHS, but her mother decided to hold her back when she went to Eagle Hill on the recommendation of the private professionals that worked with I.W. (Hearing Transcript [23-5], at 149:12–13 (Mother); Df.'s Cross-Response to Pls.'s SOF [32], at ¶ 49.) I.W. was accepted at Eagle Hill on June 26, 2015. (Acceptance Letter 6/26/2015 [23-2], at AR 383.) Parents paid her enrollment deposit on July 1, 2015, half of her tuition on July 2, 2015, and the other half on September 4, 2015. (Account Statement [23-2], at AR 386. *See also* I.H.O. Order [32-1], at AR 278.)

have a diagnosis of ADHD, the inattentive sub-type. Additionally, Eagle Hill can provide a program for students who . . . have difficulty with executive function skills. We are not able to work with a student who displays significant hyperactivity, impulsivity, or difficulty with self-control." (*Id.*) Before I.W. was admitted to Eagle Hill, I.W.'s family visited the school. The school interviewed her several times and reviewed her files, including her past evaluations. (*Id.* at 151:8–152:7.) The school admitted her for the 2015-2016 school year, and later re-admitted her for 2016-2017.

I.W.'s mother testified about her reasons for choosing Eagle Hill: "[F]irst of all if you read, they are specialized in language based learning disabilities, also ADHD. They know how to administer medication. They also have four children[10] in a class. They also had social pragmatics as classes, not one hour one day a week." (Hearing Transcript [23-5], at 148:12–17 (Mother).) I.W.'s mother noted that the environment for I.W. was "[v]ery, very structured. When she got up at 7:30 in the morning until 8:00 at night she had things to do." (*Id.* at 149:6–8.) "[T]hey had . . . speech and language pathologists there, and every class knew or also understood that each child had that language based learning disability so they would be able to conduct the class for that type of disability." (*Id.* at 153:22–154:2.) Ms. Lane, I.W.'s speech pathologist, had also spoken with the Eagle Hill staff and testified that "[t]hey presented as a school that was going to be able to service a child with a language based learning disability." (Hearing Transcript [23-7], at 658:21–659:1 (Lane).)

While at Eagle Hill for the 2015-2016 school year, I.W. took 17 courses ranging from "Thoreau" to "Counseling." (Report Card [23-2], at AR 390.) The school year at Eagle Hill is comprised of nine terms of four weeks each. (Hearing Transcript [23-5], at 155:9 (Mother).) Some of the classes I.W. took appear to have been specifically targeted to address I.W.'s needs and disabilities: "Establishing Relationships" for two terms, "Seminar on Learning" for three terms,

---

[10] The Eagle Hill website states that it has "an average class size of six students." (Website [23-3], at AR 784.)

"Reading Comprehension for Fiction" for four terms, "Textbook Study Skills" for two terms, and "Assistive Technology" for one term. (Report Card [23-2], at AR 390.) I.W's mother testified that the classes at Eagle Hill were modified by level: "They might have had, like let's just say health, but they had health for different levels. So she was in a class maybe with . . . a sophomore and freshman and maybe a junior. It was by levels of their ability." (Hearing Transcript [23-5], at 183:17–23 (Mother).) The Eagle Hill website corroborates that "learning is individualized and tailored to meet the specific learning needs of each student" at the school. (Website [23-3], at AR 784.)

For each class that I.W. took, her teachers prepared a short narrative about what work she did in the course and how she performed.[11] (Report Card [23-2], at 392–405.) Unfortunately, these pages in the administrative record are cropped, allowing the court to see only portions of the narratives. (*See* [23-2], at 395–405.) It is unclear to the court whether the Hearing Officer himself had access to the full text of the narratives, or whether his access was also restricted. The parties provide no additional information about the narratives—no indication of when they were prepared or what instructions teachers were given for writing the narratives. No Eagle Hill teachers or staff testified as to their preparation, and there is no evidence that I.W.'s parents ever observed her activities at Eagle Hill. (*See* Hearing Transcript [23-2], at 34:24–35:2 (Mother).)

The available evidence in I.W.'s Eagle Hill report card shows she struggled but experienced some success. Her teachers noted that, "[at] times, she was unfocused," and that she "required prompts to stay on task to complete her daily assignments." (Report Card [23-2],

---

[11]     The Defendant District contends that the substance of these narratives constitutes hearsay. (*See* Df.'s Cross-response to Pl.'s SOF [32], at ¶ 59.) The Defendant did not raise this objection at the hearing when the narratives were admitted into the record by the Hearing Officer as part of Hearing Exhibit #15. (Report Card [23-2], at AR 390.) As explained below, the substance of the narratives is hearsay, but that would not have prevented the hearing officer, nor does it prevent this court, from considering them.

at AR 397, 398.)  Her teacher for a class on Reading Comprehension for Fiction[12] observed, however, that I.W. worked "to build up her vocabulary via daily review and weekly vocabulary bingo games.  [I.W] is actively working on retaining the definitions of favorite words and is more confident saying words."  (*Id.*)  Another teacher reported that I.W. "has done well integrating herself back into the EHS community, exhibiting a good amount of independence, emotional control and socialization with peers."  (*Id.* at AR 398.)

Three teachers' reports regarding I.W.'s 2015-2016 school year at Eagle Hill also appear in the record, as part of a September 2016 LFHS IEP.[13]  (Sept. 2016 IEP [23-2], at AR 580; Teacher Reports in Sept. 2016 IEP [23-2], at AR 621–22.)  Karen Nastasi, who was I.W.'s academic advisor and Introduction to Algebra teacher at Eagle Hill, reported that I.W. "benefitted from the small group instruction in all of her classes" at Eagle Hill.  (Teacher Report [23-2], at AR 621.)  I.W. was "given the encouragement, redirection, and positive reinforcement necessary for her to feel as if she is a part of the learning process," and she was able to attend office hours and receive "assistance during her mandatory study hall in the evenings."  (*Id.*)  Ms. Nastasi also reports that I.W.'s "Seminar on Learning" course was one that "offers students various ways in which to view their learning differences, presents strategies designed to assist the students academically and socially, and ways in which students can advocate for themselves."  (*Id.*)  Finally, Ms. Nastasi noted that I.W. benefitted from Eagle Hill's "pragmatics department," which "assists students with the social realm by allowing them to practice in authentic situations, including the dormitory, athletic field or in the classroom, and most importantly, takes advantage of 'teachable moments.'"  (*Id.*)

---

[12]     The court can only see "prehension for Fiction" as the title of the course, due to the cropped nature of the page.  The court determined the full title of the course by looking to classes listed in the report card found at AR 390.

[13]     This IEP will be discussed later in the opinion.  The District objects to these teachers' reports as hearsay.  (Df.'s Cross-response to Pl.'s SOF [32], at ¶¶ 59, 62, 63.)  As will be explained later in this opinion, the fact that the reports contain hearsay does not prevent the court from considering them in this context.

Not everything at Eagle Hill went well for I.W. Elise Johnson, I.W.'s Resident Counselor, noted that I.W. "did experience a considerable amount of anxiety around her peer relationships and social situations." (*Id.* at AR 622.) At some point during the 2015-2016 school year, I.W. came home for four days due to her anxiety. (I.H.O. Opinion [23-1], at AR 279–80.) "This anxiety abated throughout the year as she grew more comfortable," however, and I.W. "became more willing to accept help" as the year went on. (Teacher Report [23-2], at AR 622.) None of these teachers testified at the due process hearing.

When I.W. came home for the 2016 summer, the professionals who worked with her noted her progress. Dr. Bloomberg wrote in a letter, admitted into evidence by the Hearing Officer, stating: "[I.W.] has done well this summer in large part because of the strides she made at Eagle Hill School." (Letter 9/2/2016 [23-3], at AR 739). He recommended that I.W. "continue living and studying at Eagle Hill which has produced such a remarkable improvement in her psychiatric stability." (*Id.*) A letter by Ms. Lane, included in the September 2016 IEP, also noted I.W.'s progress:

> [I.W.'s] presentation was noticeably different this summer. She is currently demonstrating a significant increase in understanding of narrative components . . . [and] is more available to actively participate in therapy. She appears more comfortable, asks informed questions and overall is demonstrating more effort. She continues to present with deficits in the area of reading comprehension and memory for text. Her improvement in these skills directly follow her first year at Eagle Hill School. This programming appears to have facilitated [I.W.'s] growth in both academic skills as well as confidence.

(Speech and Language Therapy Update in Sept. 2016 IEP [23-2], at AR 595–96.) I.W.'s parents had filed a due process complaint against the Defendant District in April 2016, arguing that the District had failed to provide I.W. with a FAPE, and requesting tuition reimbursement. (Df.'s Cross-Response to Pl.'s SOF [32], at ¶ 75.) "[P]ursuant to an interim Mediation Agreement after the commencement of [those] proceedings, the School District conducted a re-evaluation of [I.W.]." (I.H.O. Order [23-1], at AR 280; Df.'s Cross-Response to Pl.'s SOF [32], at ¶ 74.) On September 6, 2016, LFHS completed another IEP for I.W., using the new evaluation. (IEP 9/6/2016 [23-2], at AR 580.) In this IEP, the IEP team determined that a residential program like

Eagle Hill was not necessary and that a therapeutic day school placement would be appropriate for I.W.  (Hearing Transcript [23-6], at 131:18–24 (Shane).)

## IV.    2016-2017 School Year

Parents disagreed with the recommendation, and I.W. returned to Eagle Hill School for the 2016-2017 school year.  Just weeks into the school year, however, on October 3, 2016, she was expelled from the school after getting into a fight.  (I.H.O. Order [23-1], at AR 281.)  Her mother reports that Eagle Hill has a "zero tolerance policy" for fighting.  (Hearing Transcript [23-5], at 158:6–15 (Mother).)  Upon returning to Illinois, and through the date of the due process hearing, I.W. was attending Bridgeview Challenger School, a therapeutic day school.  Mother testified that I.W. has had trouble adjusting to this new setting: "It's been – it's very, very depressing for her.  She is very – her self esteem is very low. . . . [A]s far as the learning, they aren't really able to teach her because she's so up and down there with her moods and anxiety." (*Id.* at 159:19–160:2.)  I.W.'s placement at that school is not at issue in this case.

## V.    Procedural History

Parents filed their request with the Illinois State Board of Education ("ISBE") for a due process hearing in April 2016.  (Hearing Request 4/26/2016 [23-1], at AR 4–10.)  In that request, they explained that they "[sought] an order . . . requiring Community High School District #115 to compensate them for the cost of [I.W.'s] placement at Eagle Hill."  (*Id.* at AR 6–7.)  ISBE appointed an impartial due process hearing officer on June 22, 2016.  (Letter 6/22/2016 [23-1], at AR 13.) The hearing began on April 12, 2017 and testimony was heard over four non-consecutive days. Both parties were represented by counsel.  The testifying witnesses included I.W.'s mother, Ms. Secker, Ms. Shane, Ms. Grosskopf (I.W.'s LFHS Math teacher), Mr. Busse (I.W.'s LFHS Wellness for Life teacher), Ms. Antrim (I.W.'s LFHS Art teacher), Ms. Lane, Dr. Bloomberg, Ms. Manzella, Ms. Kroft, and Ms. Sterpin (LFHS' current Director of Special Education).  I.W. did not testify, nor did any teacher or staff from Eagle Hill.

The Hearing Officer issued his Final Determination and Order on June 19, 2017, finding that I.W.'s past IEP's had been either procedurally or substantively flawed, and that the District had thus failed to provide I.W. a FAPE. Based on the 2007 and 2010 Evaluations, and the testimony of Ms. Lane and Ms. Kroft, the Hearing Officer determined that I.W.

> requires direct instruction, a high level of structure to her days, small class sizes, one-on-one attention, coordination between speech and language therapy services and language arts instruction, multi-sensory instruction in math, modifications in course material, assistive technology for written expression, and other accommodations and modifications for instruction, homework and other assignments, and exams such as extra time, preferential classroom seating and a separate testing area.

(I.H.O. Order [23-1], at AR 275.) The IEP's were deficient in meeting these needs. (*Id.*) The Hearing Officer nevertheless concluded that I.W.'s parents were not entitled to reimbursement because they had "not met their burden of establishing that the Eagle Hill School was an appropriate placement for [I.W.]." (I.H.O. Order [23-1], at AR 284.) Importantly for this appeal, the Hearing Officer noted that

> [t]he information in the record on Eagle Hill consists of the testimony of the Student's Mother, who did not directly observe the Student's instruction at Eagle Hill, three pages of staff reports submitted in response to a request from the Parents that are part of Exhibit #28 [the September 2016 IEP], and Exhibit #49, a single page from Eagle Hill's web site or blog that briefly describes Eagle Hill School and the types of students it serves. . . . No Eagle Hill IEPs, individualized service plans, goal statements, or evaluation reports regarding the Student were offered into the record. There was no testimony from Eagle Hill staff or administrators.

(I.H.O. Order [23-1], at AR 279.) Noting that Mother "ha[d] no firsthand knowledge of the classes or supports" for I.W. at Eagle Hill, that "Dr. Bloomberg and Ms. Lane testified that they had limited contact with [I.W.] and the staff at Eagle Hill during the 2015-16 school year," and that "grades alone are not sufficient proof that [I.W.]'s unique educational needs were being addressed," the Hearing Officer determined that the evidence was insufficient to prove Eagle Hill was an appropriate placement. (*Id.* at AR 285–86.) Thus, he denied Parents reimbursement for I.W.'s Eagle Hill tuition. I.W., through her parents, filed this appeal on October 13, 2017.

<u>**DISCUSSION**</u>

"If parents believe that the state has failed" to provide their child a FAPE, the parents may, "at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 111 (2d Cir. 2007). However, "[p]arents who unilaterally change their child's placement without state or local school officials' consent are entitled to reimbursement only if a federal court concludes both that the public placement violated the IDEA and that the private school placement was proper[14] under the Act." *M.B.*, 668 F.3d at 864 (internal quotation marks omitted) (quoting *Todd v. Duneland School Corp.*, 299 F.3d 899, 905 (7th Cir. 2002)). In this case, neither Parents nor the District challenge the Hearing Officer's determination that the District failed to provide I.W. with a FAPE. Thus, the first prong of the reimbursement test is met. Parents argue, however, that the Hearing Officer erred in his determination of propriety of the private school placement.

Though the Seventh Circuit has not laid out a clear rule defining appropriate or proper unilateral placement, case law from other circuits is helpful. The Second Circuit has explained that, generally, "the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's placement is appropriate should be considered in determining the appropriateness of the parents' placement. . . . [T]he issue turns on whether a placement—public or private—is 'reasonably calculated to enable the child to receive educational benefits.'" *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (modifications in original) (quoting *Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006)). Unlike

---

[14] The Hearing Officer and the parties use "appropriate" instead of "proper" when referring to this prong of the test. (*See* I.H.O. Order [23-1], at AR 281–82 ("Secondly, they must show that the private placement was appropriate to meet the Student's needs."); Pl.'s Memo of Law in Opposition to Df.'s Cross-Motion for Summary Judgment [33], at 3 ("[T]he I.H.O.'s determination that Parents failed to demonstrate that Eagle Hill was an appropriate placement is not supported by the record."); Df.'s Memo of Law in Support of its MSJ [26], at 7 ("Parents must establish . . . that their private placement, Eagle Hill, was appropriate.").) The Code of Federal Regulations similarly uses "appropriate" instead of "proper." 34 C.F.R. § 300.148(c) (providing regulations regarding reimbursement). The court deems the terms interchangeable.

public schools, private placement "need not meet state education standards or requirements," *Frank G.*, 459 F.3d at 364 (citing *Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 14 (1993)), nor "provide certified special education teachers or an IEP for the disabled student." *Frank G.*, 459 F.3d at 364. The Second Circuit has also explained that "parents [are] not required . . . to prove that the 'private placement furnishes every special service necessary'" for the student. *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 839 (2d Cir. 2014) (quoting *Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 365 (7th Cir. 2006)). *See Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 25 (1st Cir. 2007) ("[A] private placement need provide only 'some element of the special education services' missing from the public alternative in order to qualify as reasonably calculated to enable the child to receive educational benefit.") (quoting *Berger v. Medina City School Dist.*, 348 F.3d 513, 523 (6th Cir. 2003)). The Third Circuit agrees: "the test for the parents' private placement is that it is appropriate, and not that it is perfect." *Warren G. ex rel. Tom G. v. Cumberland Cty. Sch. Dist.*, 190 F.3d 80, 84 (3d Cir. 1999).

Within this legal framework, Parents argue that the Hearing Officer erred when he determined that Parents failed to prove that Eagle Hill was an appropriate placement for I.W. First, they argue that the Hearing Officer "failed to consider" the teacher narratives that accompany I.W.'s Eagle Hill report card. (Pl.'s Memo of Law in Opposition to Df.'s Cross-Motion for Summary Judgment [33], at 3; Eagle Hill Report Card [23-2], at AR 391–405.) They contend that these narratives provide sufficient evidence that Eagle Hill was an appropriate placement. Second, Parents argue that the Hearing Officer "failed to consider or comment on the plethora of evidence and testimony showing IW made significant progress at Eagle Hill." (*Id.*) The Defendant District counters that the teacher narratives are inadmissible hearsay, that the Hearing Officer gave appropriately little weight to the teacher narratives, and that proof of I.W.'s progress does not render the private placement appropriate.

## I.    Eagle Hill Report Card Narratives

The District is technically correct that the Eagle Hill teachers' narratives, when considered for their truth, constitute hearsay under the Federal Rules of Evidence.   The District did not, however, raise this objection at the due process hearing.   (Hearing Transcript [23-5], at 173:24–174:6 (admitting the Eagle Hill report card packet as Hearing Exhibit 15 (AR 390–405) without objection from defense counsel.)  Nor is it clear that such an objection should be sustained: ISBE guidance explains that the "federal or state rules of evidence do not apply to the IDEA hearing process" in Illinois.   Illinois State Board of Education, Division of Special Education and Support Services, APPROPRIATE STANDARD PRACTICES FOR ILLINOIS SPECIAL EDUCATION DUE PROCESS PROCEEDINGS IX.D.1 (May 5, 2016), https://www.isbe.net/Documents/due-process-standard-practices.pdf.  *See Sykes v. D.C.*, 518 F. Supp. 2d 261, 268 (D.D.C. 2007) (noting that the IDEA does "not explicitly ban[ ] hearsay evidence from administrative proceedings held pursuant to the statute").   Instead, "Hearing Officers may admit and give probative effect to evidence of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs."  Illinois State Board of Education, at IX.D.3.  *See also Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 61 (2005) ("IDEA hearings are deliberately informal and intended to give ALJs the flexibility that they need to ensure that each side can fairly present its evidence.").   The District does not challenge the authenticity of this material, which came as part of I.W.'s Eagle Hill Report card, on Eagle Hill report card letterhead.   Because the Hearing Officer admitted the evidence into the record, the court will not bar it here.

The District next argues that the Hearing Officer gave appropriately little weight to the Eagle Hill teacher narratives.   It is not clear from his order, however, that the Officer gave the report card narratives *any* weight.   *Cf. A.V. v. Burlington Twp. Bd. of Educ.*, No. 06-1534JBS, 2007 WL 1892469, at *13 (D.N.J. June 27, 2007) (giving "due weight" to a due process ALJ's finding that a student had a "severe learning disability" but not that he was a "non-reader," when

it was "clear that the ALJ considered all evidence").  The Hearing Officer's findings of fact in this case made no mention of the report card narratives:

> The information on the record on Eagle Hill consists of the testimony of the Student's Mother, who did not directly observe the Student's instruction at Eagle Hill, three pages of staff reports[15] submitted in response to a request from the parents that are part of Exhibit #28 [the September 2016 IEP], and Exhibit #49, a single page from Eagle Hill's web site or blog that briefly describes Eagle Hill School and the types of students it serves.

(I.H.O. Order [23-1], at AR 279.)   The Officer did note in his legal analysis of the private placement that I.W. "had passing grades at Eagle Hill School."  (*Id.* at AR 285 (citing Report Card [23-2], at AR 390).)   He gave those grades little probative weight, explaining that "[t]he record has no information other than the brief written summary reports from the teachers [included in the September 2016 IEP] . . . as to how [I.W.] earned her grades."  (I.H.O. Order [23-1], at AR 286.) As he made no reference to the report card teacher narratives here, it is unclear whether the Hearing Officer afforded them no weight or simply overlooked them.[16]   The court remands the case to the Hearing Officer for reconsideration of his propriety finding, in light of the teacher narratives included in I.W.'s Eagle Hill report card.  *See Z.J. v. Bd. of Educ. of the City of Chicago, Dist. No. 299*, 344 F. Supp. 3d 988, 1002 (N.D. Ill. 2018) (granting Plaintiffs' motion for summary judgment in an IDEA appeal and remanding to the hearing officer for further "determin[ation] of what compensatory services, if any" are owed by a school district to a student who was denied a

---

[15]      This is a reference to reports from three Eagle Hill staff members included in I.W.'s September 2016 IEP, not to the narratives.  (*See* Teacher Reports in Sept. 2016 IEP [23-2], at AR 621–22.)  This is clear from the Hearing Officer's reference to Exhibit #28, which is the exhibit number given to the September 2016 IEP at the hearing.  The report card narratives, instead, were part of Hearing Exhibit #15, beginning in the record at AR 390.

[16]      The District argues that the Hearing Officer failed to mention the report card narratives because they "were [not] so much as mentioned by any of Parents' witnesses."  (Df.'s Response in Opposition to Pl.'s Cross-motion for SJ [31], at 5.)  However, when the Hearing Officer notes that the "record has no information other than the brief written summary reports from teachers (Exhibit #28) as to how [I.W.] earned her grades," this is a misstatement.  The report card narratives constitute part of the administrative record and were admitted into evidence by the Hearing Officer.  The Defendant District also argue that Parents did not provide any "direct evidence regarding the appropriateness of Eagle Hill."  (*Id.* at 6.)  Yet, the District provides no law, and the court is not aware of any, requiring *direct* evidence of appropriateness.

FAPE); *M.O. v. D.C.*, 20 F. Supp. 3d 31, 33 (D.D.C. 2013) (denying cross motions for summary judgment in a case where Plaintiffs claimed a school district failed to provide a student with a FAPE, and remanding to the hearing officer "for further evaluation of the evidence")).

The Hearing Officer's remaining factual findings are supported. *See Demarcus L. v. Bd. of Educ. of the City of Chicago*, No. 13 C 5331, 2014 WL 948883, at *6 (N.D. Ill. Mar. 11, 2014) (noting that "federal courts review the IHO's credibility determinations for clear error and only reverse an IHO's credibility determinations if they are patently wrong") (citing *Marshall Joint Sch. Dist. No. 2 v. C.D. ex rel. Brian D.*, 616 F.3d 632, 638 (7th Cir. 2010)). The Hearing Officer's weighing I.W.'s mother's testimony was not clearly erroneous, nor was his weighing of the testimony of Dr. Bloomberg and Ms. Lane, who testified about I.W.'s progress but had "limited contact" with I.W. while she was at Eagle Hill. (I.H.O. Order [23-1], at AR 285–86.) The court encourages the Hearing Officer on remand to reweigh that testimony in light of the information provided in the Eagle Hill teacher narratives.

## II.     Evidence of I.W.'s Progress at Eagle Hill

Parents argue in the alternative that I.W.'s progress at Eagle Hill supports a finding that the private placement was proper. "Progress in a unilateral placement, however, is not dispositive, and the Court must consider whether 'the totality of the circumstances' demonstrates that the 'placement reasonably serves a child's needs.' " *D.D-S. v. Southold Union Free Sch. Dist.*, No. 09-CV-5026 JS WDW, 2011 WL 3919040, at *14 (E.D.N.Y. Sept. 2, 2011) (quoting *Frank G.*, 459 F.3d at 364), *aff'd*, 506 F. App'x 80 (2d Cir. 2012). "Progress may be demonstrated by grades, test scores, regular advancement, or other objective evidence, but no single factor is dispositive." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 836 (2d Cir. 2014). *See Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 522 (6th Cir. 2003) ("[E]vidence of academic progress at a private school does not itself establish that the private placement offers adequate and appropriate education under the IDEA."). The Hearing Officer is correct that "grades alone are not sufficient proof that the [I.W.'s] unique educational needs were being addressed" at Eagle Hill. (I.H.O.

Order [23-1], at AR 285.)  It appears, however, that he gave almost no weight to her grades, due to the lack of information on the record "as to how she earned" them.  (*Id.* at 286.)  The Hearing Officer's reconsideration of the report card teacher narratives may help alleviate that concern.

The Hearing Officer also paid little attention to other evidence of I.W.'s progress during or following her first year at Eagle Hill.  He conclusively noted that I.W. "did not make progress in many of her areas of need," but he does not explain how he came to that conclusion, nor does he cite any evidence from the record.  This court's own review of the administrative record suggests that I.W. did make social, psychiatric, and academic progress at Eagle Hill.  (*See, for example*, Eagle Hill Report Card [23-2], at AR 390–405; Teacher Reports in Sept. 2016 IEP [23-3], at AR 621–22; Letter from Dr. Bloomberg [23-3], at AR 739; Speech and Language Therapy Update included in 2016 IEP [23-3], at 595–96.)  The court remands the case so that the Hearing Officer may weigh such evidence in making his propriety determination.

## CONCLUSION

Plaintiffs' and Defendant's motions for summary judgment [25, 28] are denied.  The Hearing Officer's Order is vacated, and the case is remanded to the Hearing Officer for further consideration consistent with this opinion.

ENTER:

Dated:  February 7, 2019

_____
REBECCA R. PALLMEYER
United States District Judge